IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

| | |
|---|---|
| JUSTIN FESSLER,<br><br>               Plaintiff,<br><br>v.<br><br>INTERNATIONAL BUSINESS MACHINES CORPORATION,<br><br>               Defendant. | Civ. No.<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Justin Fessler, complaining of the acts of Defendant International Business Machines Corporation ("IBM"), alleges and states the following:

## PARTIES

1. Mr. Fessler is a citizen of Arlington, Virginia domiciled in Arlington County.

2. IBM was incorporated, and is existing, under the laws of the State of New York. IBM's principal place of business is in the State of New York.

## JURISDICTION AND VENUE

3. Subject matter jurisdiction over this matter is conferred upon and vested in this Court under 28 U.S.C. § 1332.

4. This Court has personal jurisdiction over IBM.

5. Venue is proper in this Court.

6. This action has been brought within all applicable statute of limitations and/or repose.

## FACTUAL ALLEGATIONS

7. Mr. Fessler is a seasoned software sales representative that has worked at IBM since 2008.

8. Mr. Fessler joined IBM on or about October 6, 2008 as an inside sales software seller. Starting in 2009, Mr. Fessler became an inside sales information management specialist for the United States Federal Government.

9. During his tenure with IBM, Mr. Fessler was very successful and highly respected in his position, and received positive ratings in every performance review. Mr. Fessler received awards for the 100% quota club several years, and received IBM Blue Point awards for exemplary performance. Mr. Fessler has also participated in other IBM growth and thought leadership programs such as Anne Altman's Millennial Council and the Harvard Business School Review, and has been sponsored by many Federal Government programs to speak with, and for them, on topics such as Artificial Intelligence, Information Governance, and Machine Learning.

### IBM Promised Mr. Fessler His Commissions Were Uncapped.

10. Mr. Fessler's compensation as an IBM sales representative consisted of a base salary paired with uncapped commissions. Mr. Fessler received commissions of 5% of his sales through 2016. In 2017, Mr. Fessler's commissions consisted of a tiered, uncapped commission based on net new revenue as well as deployment.

11. Mr. Fessler's commission plan for the first half of 2016 ran from January 1, 2016 through June 30, 2016. Upon information and belief, IBM offered the written (electronic) commission plan to Mr. Fessler ("the Incentive Plan Letter" or "IPL") several weeks into 2016.

12. Around the time that Mr. Fessler accepted the IPL, IBM presented to him and similar salespeople a PowerPoint presentation describing the terms of the commission plan being offered to them. Upon information and belief, IBM presented the PowerPoint to Mr. Fessler both before and after the IPL was presented to him. The PowerPoint was also available for Mr. Fessler, and other salespeople, to download during the entirety of the sales period (January-June of 2016) and afterwards.

13. IBM made a substantially similar version of this PowerPoint available to Mr. Fessler each year for the purpose of explaining the important terms of his compensation.

14. The PowerPoint was titled "Our Purpose, Values & Practices" relating to "Your 2016 Incentive Plan," and it stated that the goal of the incentive plan is "to design and deliver sales incentives that motivate your performance and are strategically aligned with IBM's strategy and transformation." Page 13 specifically stated that "[e]arnings opportunity remains uncapped." In fact, the presentation mentions no less than six times in its 18 pages that "payments" and/or "earnings opportunit[ies]" are "uncapped."

15. These representations were repeated in sales meetings and by IBM managers.

16. These representations are also in line with IBM's written guidance to its managers, which provides:

> Conditions that may lead to an adjustment include the need to correct errors or the need to balance with employee's contribution to the success of a large sales transaction (which criteria must be clearly provided to Commissions team).
>
> **Adjustments must not be done only as a ceiling or cap on the total earnings allowable to employees.**

17. In other words, IBM's official policies provide that sales representatives commissions may be adjusted to correct errors, but their commissions may not be arbitrarily capped for the purpose of limiting the employee's earnings.

18. Here, Mr. Fessler's commissions were not adjusted as a result of any errors and no need to balance his contribution to the success of the deals were ever articulated. Rather, Mr. Fessler's commissions were arbitrarily capped for the sole purpose of limiting his earnings.

**Mr. Fessler's Commission Payments Were Capped in 2016.**

19. In 2016, Mr. Fessler worked on behalf of IBM to close a large deal of IBM Watson Division products and services with the United States Census Bureau ("Census Bureau Deal"). Indeed, since May of 2015, until September 2016, Mr. Fessler was the sole sales representative responsible for this account and worked diligently to close a deal for the IBM Watson Division products and services.

20. Mr. Fessler's effort in closing the Census Bureau Deal resulted in a total sale of approximately $8,900,000 of Watson Division products and services. However, IBM arbitrarily only credited Mr. Fessler with $5,164,000 worth of sales. His quota at the time was $3,500,000.

21. On the recognized amount of $5,164,000, Mr. Fessler earned a commission of $258,200 which should have been paid to him in July 2016 after the deal was closed at the end of June 2016. He was not paid any of this commission in July.

22. After approaching his manager regarding this, his manager, Kimberly Kilty informed him that because the deal was over $5,000,000, it went through an internal review process.

23. Following this supposed "internal review," Mr. Fessler was informed that IBM would only be crediting $1,000,000 worth of revenue to Mr. Fessler from the deal resulting in only $50,000 of commissions.

24. Neither his first line manager, Kimberly Kilty, or his second line manager, Amish Patel, were consulted as part of this internal review process.

25. Mr. Fessler, along with these two managers were informed by the individuals who conducted the internal review that Mr. Fessler was credited with only a fraction of the revenue due to his contribution to the deal. No further explanation as to what was meant by "his contribution to the deal."

26. Mr. Fessler was the only sales representative responsible for the Watson Division portion of the deal, which IBM recognized was $5,164,000.

27. Upon information and belief, IBM did not credit any other sales representatives with the remaining $4,164,000 worth of revenue that it arbitrarily decided not to credit to Mr. Fessler.

28. Both of his managers believed that his contribution was significant and further validated that with a majority of the contributing technical team for the deal. They did not understand why his commission was arbitrarily capped by IBM.

29. As a result of IBM's reduction of his revenue credit to $1,000,000, he was only paid $50,000, over $200,000 less than he had earned.

### Mr. Fessler's Commissions Payments Were Capped in 2017.

30. In January 2017 Mr. Fessler was moved to the analytics division from the Watson division.

31. After this reorganization, he was not assigned a manager or presented an IPL until sometime in February 2017. Upon information and belief, his compensation structure still consisted of a base salary paired with uncapped commissions equaling 5% of the total revenue. The terms of the IPL were not explained to Mr. Fessler and as he was not alerted to any changes he assumed it was the same as the previous IPLs he had accepted.

32. In May 2017, Mr. Fessler's commissions were again capped by IBM.

33. After accepting his IPL for the first half of 2017, he was informed that one of his accounts, the Department of Defense Special Operations Command, was being targeted under a special new program IBM instituted called a TAAP Plan ("Target Account Absolute Plan").

34. Under this plan, IBM elected to pay sales commissions differently than what Mr. Fessler's IPL provided and differently than the numerous representations IBM made that sales commissions were "uncapped."

35. Under the TAAP Plan, IBM apparently allocated approximately 3.5% of sales revenue to commissions for all sales representatives involved in a sale of IBM products and services to the Department of Defense Special Operations Command.

36. Mr. Fessler was not aware of this 3.5% "bucket" of commissions until after he assisted in closing a deal with the Department of Defense for $3,500,000 of IBM products and services.

37. Of this $3,500,000, the products and services Mr. Fessler was responsible for accounted for $2,000,000.

38. Mr. Fessler is not aware what commissions other sales representatives were due, so 3.5% of sales commissions to all sales representatives may have been sufficient to pay all sales representatives the commissions they were due.

39. However, Mr. Fessler was not paid the 5% commission he was due. Rather, IBM paid him about $30,000, far less than the $100,000 he was due on a sale of $2,000,000.

40. In mid-late July 2017, Mr. Fessler was provided a new IPL for the second half of 2017. This IPL again stated he was responsible for all federal accounts and was not explained to him as he was in the midst of getting new managers again. However, his commission structure changed from a flat 5% of revenue to a tiered commission structure that remained uncapped.

41. At the end of 2017, Mr. Fessler was again capped by IBM, who this time refused to pay him any commissions on a deal he was responsible for.

42. In the second half of 2017, he was working on a deal for the sale of IBM products and services that he was responsible for with the United States Customs and Border Protection agency.

43. IBM moved this account into what is internally called a "deployment account." This essentially means an account that currently holds a software contract with IBM, and IBM assigns a representative to the account to help them deploy it and make it used by the client programs.

44. Mr. Fessler's deployment quota for the second half of 2017 was $4,300,000.

45. In late December, Mr. Fessler closed a deal with the US Customs and Border Protection agency for $5,200,000. He expected his commissions on this to be paid at the end of February 2018, which he ultimately did not receive.

46. When he inquired as to the status of this payment, IBM told him they were not going to pay him on this account because they had removed it from his responsibility. This was the first time he had been told that, as in the past he was always responsible for all federal government accounts, including the US Customs and Border Protection agency.

47. Indeed, his IPL for the second half of 2017 identified that he was still responsible for all federal contracts, however, after querying his management, the incentives team informed him that this account had been removed from his responsible accounts. This had never been explained to Mr. Fessler before this time.

48. Mr. Fessler would not have worked on this account or closed this $5,200,000 deal had he known IBM was not going to pay him for his efforts.

**Since Leaving IBM, Mr. Fessler Has Learned That IBM
Routinely Breaks its Promise Not to Cap Commissions**

49. Recently, Mr. Fessler has learned that IBM has a history of capping the commissions on large sales.

50. The sales field in which Mr. Fessler worked for IBM is highly competitive, and most employers do not cap commissions. Were IBM to actually tell its salespeople that commissions could be capped, it would be severely hampered in its efforts to recruit good salespeople. As a result, IBM engages in a practice whereby it tells its salespeople that their commissions will not be capped, both verbally and in written documents like the PowerPoint presentation, and then it caps certain high-achievers after the fact.

51. There is another case pending in the Middle District of North Carolina that is very similar to this one, <u>Bobby Choplin v. International Business Machines Corporation</u>, No. 16-cv-1412-TDS-JEP ("the Choplin Action"). Upon information and belief, the plaintiff in the Choplin Action had an IPL that was in relevant part identical or substantially similar to Mr. Fessler's IPL, and the plaintiff was shown a PowerPoint presentation that was in relevant part identical or substantially similar to the PowerPoint presentation shown to Mr. Fessler. Furthermore, upon information and belief, many of the other facts and circumstances surrounding the commissions due to Mr. Choplin, and what IBM actually paid him and why, are similar to the facts and circumstances surrounding the commissions due to Mr. Fessler, and what IBM actually paid him and why.

52. In the Choplin Action, the plaintiff took four depositions: (1) a Rule 30(b)(6) deposition of IBM, through corporate designee Richard Martinotti (**Exhibit A**); (2) a deposition of Mr. Choplin's first-line (i.e., immediate) manager, Thomas Batthany (**Exhibit B**); (3) a deposition of Mr. Choplin's second-line (i.e., two levels up) manager, Haleh Maleki (**Exhibit C**);

and (4) a deposition of Mark Dorsey, a former IBM Vice President of Software Sales (i.e., one of the highest-level sales managers in the corporation) (**Exhibit D**). Together, Exhibits A, B, C, and D are referred to as the "Choplin Depositions."

53. The testimony in the Choplin Depositions make clear the following, among other things: (1) because of the statements in the PowerPoints, and in light of the IPLs, IBM had an "obligation" not to "cap" the commission for salespeople like Mr. Choplin and Mr. Fessler; (2) salespeople like Mr. Fessler were entitled to rely on the statements in the PowerPoints that their commissions would be not be "capped," and that reliance was understood by IBM and was reasonable; and (3) what IBM in fact did, when it reduced the commissions in the way that it did for Mr. Choplin and Mr. Fessler, was "capping." For example:

   a. IBM testified as follows:

   Q. The fourth bullet point, you could read that, please.

   A. "Earnings opportunity remains uncapped."

   Q. Okay. So you would agree that IBM when explaining his compensation plan for the first half of 2015 represented to Bobby Choplin that his earnings opportunity remains uncapped, wouldn't you?

   A. Correct.

   Q. Would you also agree that IBM represented to Bobby Choplin regarding his first half of 2015 compensation plan that payments were uncapped?

   A. Correct.

   Q. So would you agree that IBM had an obligation not to cap Bobby Choplin's earnings opportunity?

   A. Yes.

   Q. Would you agree that IBM had an obligation not to cap Bobby Choplin's payments?

   A. Correct.

(Exhibit A, pp. 18-19.)  When asked specifically about whether a salesperson could reasonably rely on the statements in the PowerPoints, IBM testified:

> Q. And it would be reasonable for a salesperson like Bobby Choplin to rely on the information in Exhibit 65, 66 and 67 [PowerPoints] regarding their compensation plan?
>
> A. Yes.

(Exhibit A, pp. 67-68.)

    b. Mr. Batthany testified as follows about the statements in the PowerPoint that commission would be not be capped:

> Q. Okay. It would be reasonable for someone to understand that their commission payments were uncapped in the first half of 2015, wouldn't it?
>
> A. Yes.

(Exhibit B, p. 79.)  Mr. Dorsey similarly testified that, if he were a salesperson and read the statements in the PowerPoint, he would think that his earnings were uncapped. (Exhibit D, p. 48.)

    c. Ms. Maleki testified as follows about what exactly constitutes capping:

> Q. What does that mean to you?
>
> A. Capped?
>
> Q. Right.
>
> A. Is when your commissions get reviewed, and you know, you're supposed to get paid X amount, but you get paid Y.
>
> Q. Something different than what your commission formula would produce?
>
> A. Correct.

(Exhibit D, p. 25.)

    d. Mr. Dorsey straight-up testified that IBM's statements in the PowerPoints that it did not cap were not true, and that IBM often capped:

> Q. Okay. Would you agree that under the commissions programs at IBM while you were there from the 2013 to 2015, that a software salesperson's earnings opportunity was uncapped?
>
> A. No. I don't think any -- I don't think since I was there that their earnings were ever uncapped.
>
> …
>
> Q. And you see that each of these under the earnings opportunity block on the left side of the page, the third bullet point says, "Earnings opportunity remains uncapped"?
>
> A. I do see that.
>
> Q. And that's each of these four, on page 83, page 84, page 85, page 86, every single one of these says, "Earnings opportunity remains uncapped"; is that correct?
>
> A. That's what I'm seeing, yeah.
>
> Q. But that's not true from what you remember at IBM?
>
> A. That's correct. I don't believe that's true.

(Exhibit D, pp. 43, 46-47.)

    54. The Choplin Depositions also make clear that, despite IBM's claim that it did not "cap" Mr. Choplin's commission when it reduced his commission payments, IBM employees used that exact term several times in emails when discussing the reduction in Mr. Choplin's commission payments. Upon information and belief, IBM, when referring to its reduction of Mr. Fessler's commission payments, also referred to what it was doing as "capping," "capped," "cap," or the like, including in emails sent during the period when IBM reduced Mr. Fessler's commission.

55. Indeed, an email was produced in the Choplin case where Randolph Moorer specifically "recommend[ed] capping" the commissions of another sales representative, Mr. Stephenson, commissions on both the LabCorp and BB&T Deals by approximately $600,000. (**Exhibit E**). Upon information and belief, there are other such emails where IBM discussed how it was "capping" Mr. Fessler's commissions.

56. Mr. Fessler has met all conditions precedent to the bringing of this action.

## FIRST CLAIM FOR RELIEF
### (Breach of Oral and/or Implied Contract)

57. Mr. Fessler re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

58. By the words and actions of IBM and its agents both before and after he accepted his 2016 IPL, IBM and Mr. Fessler entered into an express oral contract, and/or an implied contract, that IBM would pay Mr. Fessler the full amount of his commission without capping the amount of commissionable sales. These words and actions included: (1) the sending of the PowerPoint, which, upon information and belief, was sent to Mr. Fessler both before and after he accepted his IPL, and was always available via the intranet; (2) the statements of IBM executives at sales meetings that commissions would not be capped; and (3) the fact that IBM had never before capped a commission to Mr. Fessler's knowledge.

59. IBM breached the oral contract, and/or the implied contract, by capping Mr. Fessler's commission.

60. As a direct and proximate result of the breach by IBM, Mr. Fessler was harmed in an amount exceeding $75,000.00.

## SECOND CLAIM FOR RELIEF
**(Alternative Claim – Quantum Meruit)**

61. Mr. Fessler re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

62. Mr. Fessler alleges this claim in the alternative to his first claim.

63. To the extent that there was no written contract and to the extent that there was no oral or implied contract, then Mr. Fessler alleges a claim for quantum meruit.

64. Mr. Fessler rendered valuable consideration to IBM, in the form of work performed to close all of the deals, for which he has not been paid. The consideration has a reasonable value of *at least* $350,000, although the exact amount is for the jury.

65. At the time that Mr. Fessler performed the work, he reasonably expected to be paid by IBM. IBM received and benefited from the work with knowledge or reason to know that Mr. Fessler expected to be paid. IBM voluntarily accepted the benefit of the work and kept the benefits therefrom without waiving, refusing, or returning the benefit.

66. In the alternative to the claim for breach of contract, Mr. Fessler is entitled under the doctrine of quantum meruit to recover damages from IBM in the amount of *at least* $75,000.

## THIRD CLAIM FOR RELIEF
**(Alternative Claim – Unjust Enrichment)**

67. Mr. Fessler re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

68. Mr. Fessler alleges this claim in the alternative to his first claim.

69. To the extent that there was no written contract and to the extent that there was no oral or implied contract, then Mr. Fessler alleges a claim for unjust enrichment.

70. At the specific request of IBM and for its use and benefit, Mr. Fessler has performed work for IBM in the form of making sales of its software and services.

71. The value of the work performed for IBM by Mr. Fessler for which Mr. Fessler has not been paid is *at least* $350,000, although the exact amount is for the jury.

72. During and since the performance of the work by Mr. Fessler, IBM has failed to pay Mr. Fessler and there is due and owing to Mr. Fessler from IBM, a principal sum amount of *at least* $350,000.

73. Despite Mr. Fessler being owed in excess of another $350,000, IBM has failed and refused to pay the same or any part of it.

74. In the alternative to the claim for breach of contract, and as a result of IBM's refusal to pay Mr. Fessler the above-stated sum due and owing to Mr. Fessler, IBM has become unjustly enriched in the amount of *at least* $75,000.

**FOURTH CLAIM FOR RELIEF**
**(Fraudulent Misrepresentation)**

75. Mr. Fessler re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

76. IBM, through its agents, represented to Mr. Fessler that Mr. Fessler's commission would not be capped, in at least the following instances: (1) the PowerPoint, which, upon information and belief, was sent to Mr. Fessler both before and after he accepted his 2016 and 2017 IPLs, and was always available via the intranet; and (2) the statements of IBM executives at sales meetings that commissions would not be capped.

77. Those representations were false.

78. Upon information and belief, those representations were false when made and IBM, through its agents, knew that they were false when made. IBM intended to deceive Mr.

14

Fessler in making those misrepresentations. Simply put, IBM knew that Mr. Fessler's commissions might be and would be capped, even though it told him in all of these instances that they would not be capped.

79.    Mr. Fessler reasonably and justifiably relied on the representations of IBM. Notably, some or all of the representations were made after Mr. Fessler signed the IPL, including those in the PowerPoint, and those by IBM executives in sales meetings. Mr. Fessler reasonably and justifiably relied on the representations by, among other things, continuing to work hard and sell as much software and services as possible for the benefit of IBM. Had Mr. Fessler known that he would not be paid what he was promised and what he expected, he would have worked differently at IBM, in commensuration with his actual compensation, and/or he would have sought another job that paid him what his efforts were worth and/or did not cap commissions. Had Mr. Fessler known that he would be capped as he was, he would have worked his deals differently at IBM so as to maximize his compensation.

80.    Mr. Fessler was damaged by IBM's fraudulent statements in an amount exceeding $75,000.

### FIFTH CLAIM FOR RELIEF
**(Alternative Claim - Negligent Misrepresentation)**

81.    Mr. Fessler re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

82.    Mr. Fessler alleges this claim in the alternative to the claim for fraudulent misrepresentation.

83.    IBM, through its agents, represented to Mr. Fessler that Mr. Fessler's commission would not be capped, in at least the following instances: (1) the PowerPoint, which, upon information and belief, was sent to Mr. Fessler both before and after he accepted his 2016 and

2017 IPLs, and was always available via the intranet; and (2) the statements of IBM executives at sales meetings that commissions would not be capped.

84. IBM's agents made the representation negligently, without exercising the care that a reasonable person would exercise in the circumstances. IBM made the representations with the knowledge and intention that Mr. Fessler rely on the statements, and Mr. Fessler reasonably and justifiably relied on the representations of IBM.

85. Notably, some or all of the representations were made after Mr. Fessler signed the IPL, including those in the PowerPoint, and those by IBM executives in sales meetings. Mr. Fessler reasonably and justifiably relied on the representations by, among other things, continuing to work hard and sell as much software and services as possible for the benefit of IBM.

86. Had Mr. Fessler known that he would not be paid what he was promised and what he expected, he would have worked differently at IBM, in commensuration with his actual compensation, and/or he would have sought another job that paid him what his efforts were worth and/or did not cap commissions. Had Mr. Fessler known that he would be capped as he was, he would have worked his deals differently at IBM so as to maximize his compensation.

87. IBM owed Mr. Fessler a duty of care in making the representations.

88. Mr. Fessler reasonably and justifiably relied on the representations of IBM.

89. Mr. Fessler was damaged by IBM's negligent misrepresentations.

90. Mr. Fessler has been damaged by IBM's negligence in an amount exceeding $75,000.00.

## SIXTH CLAIM FOR RELIEF
**(Punitive Damages)**

91. Mr. Fessler re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

92. The actions and conduct of IBM, as set forth herein, entitle Mr. Fessler to compensatory damages, and are accompanied by aggravating factors which caused and relate to Mr. Fessler's injuries which give rise to his claim for compensatory damages.

93. This conduct, as set forth herein, includes, among other things, fraud.

94. IBM facilitated the conduct constituting fraud and the willful, wanton, and outrageous conduct giving rise to punitive damages, as set forth herein and otherwise.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Fessler prays the Court for the following relief:

1. Mr. Fessler have and recover from IBM for breach of the oral or implied contract compensatory damages of approximately $400,000, plus interest from the date of breach, plus interest on the judgment until paid in full at the legal rate as allowed by law;

2. In the alternative, that Mr. Fessler have and recover from IBM for quantum meruit or unjust enrichment in an amount to be determined at trial, plus interest on the judgment until paid in full at the legal rate as allowed by law;

3. Mr. Fessler have and recover from IBM for fraudulent misrepresentation in the amount of approximately $400,000;

4. Mr. Fessler have and recover from IBM for negligent misrepresentation in the amount of approximately $400,000;

5. That Mr. Fessler be awarded punitive damages;

6. That all costs of this action be taxed against IBM; and

7. That the Court award Mr. Fessler such other and further relief as this Court may deem just and proper.

## JURY DEMAND

PLAINTIFF DEMANDS A TRIAL BY JURY.

June 27, 2018                                             Respectfully submitted,

/s/ Timothy R. Clinton
Timothy R. Clinton (VA Bar No. 70902)
Tim@ClintonBrook.com
**Clinton Brook & Peed**
1455 Pennsylvania Ave NW, Suite 400
Washington, DC  20004
Tel: (202) 621-1828

Matthew E. Lee*
N.C. State Bar No. 35405
Jeremy R. Williams*
N.C. State Bar No. 48162
**WHITFIELD BRYSON & MASON, LLP**
900 W. Morgan Street
Raleigh, NC 27603
Telephone:    919-600-5000
Facsimile:      919-600-5035
matt@wbmllp.com
jeremy@wbmllp.com

Mark R. Sigmon*
N.C. State Bar No. 37762
**SIGMON LAW, PLLC**
5 West Hargett Street, Suite 1001
Raleigh, North Carolina 27601
Telephone:    (919) 451-6311
Fax:              (919) 882-9057
mark@sigmonlawfirm.com

*Attorneys for Plaintiff Justin Fessler*

* to seek admission *pro hac vice*