# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF VIRGINIA
# Alexandria Division

| | |
|---|---|
| JUSTIN FESSLER, <br>     Plaintiff, <br><br> v. <br><br> INTERNATIONAL BUSINESS MACHINES <br> CORPORATION, <br>     Defendant. | ) <br> ) <br> ) <br> )    Civil Action No. 1:18-cv-798 <br> ) <br> ) <br> ) <br> ) <br> ) |

## MEMORANDUM OPINION

This is a dispute between plaintiff, Justin Fessler, and his former employer, defendant International Business Machines Corporation ("IBM"), over whether Fessler is owed additional commissions. Fessler contends that IBM was obligated to pay him uncapped commissions and failed to do so. For its part, IBM contends that it had no obligation to pay Fessler any additional commissions.

For the reasons that follow, IBM's Motion to Dismiss must be granted.

### I.

The Rule 12(b)(6) standard is too well-settled to warrant extensive discussion. In essence, on a threshold motion to dismiss, a court must determine whether the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted).

### II.[1]

Fessler began employment with IBM as a salesman in 2008. His compensation consisted of a base salary and commissions. During the period relevant to this dispute, Fessler had three

---

[1] The facts recited herein are derived from Fessler's Complaint.

1

commission plans. The first was in effect from January 1, 2016 through June 30, 2016, the second was in effect from January 1, 2017 through June 30, 2017 and the third was in effect from July 1, 2017 through December 21, 2017. Each plan was described in a written Incentive Plan Letter ("IPL") that Fessler accepted.[2] The IPL for each period described the terms of the commission plan offered to, and accepted by, Fessler. Each IPL contained a number of disclaimers that were, with one exception, essentially identical in relevant part. Specifically, each IPL contained a "Right to Modify or Cancel" disclaimer. In the first half of 2017, the IPL stipulated that

> The Plan does not constitute an express or implied contract or a promise by IBM to make any distributions under it. IBM reserves the right to adjust the Plan terms, including, but not limited to, changes to sales performance objectives, assigned territories or account opportunities, applicable incentive payment rates or similar earnings opportunities, or to modify or cancel the Plan, for any individual or group of individuals, including withdrawing your accepted Incentive Plan Letter if your incentive eligibility status changes.

Def.'s Ex. 2. The IPLs for the first half of 2016 and second half of 2017 contained essentially identical disclaimers.[3] The IPLs also contained disclaimers about "Adjustments for Errors." Specifically, each IPL provided that

> IBM reserves the right to review and, in its sole discretion, adjust or require repayment of incorrect incentive payments resulting from incomplete incentives processes or other errors in the measurement of achievement or the calculation of payments, including errors in the creation or communication of sales objectives. Depending on when an error is identified, corrections may be made before or after

---

[2] The IPLs attached to IBM's Motion to Dismiss may be considered at this stage because they were integral to the Complaint and Fessler does not dispute their accuracy. *See Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (noting that, on a motion to dismiss, courts "may consider a document submitted by the movant that was not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity").

[3] Unlike the 2017 IPLs, the IPL for the first half of 2016 stipulated that "IBM reserves the right to adjust the Plan terms . . . up until any related payments have been earned under the Plan terms." Def.'s Ex. 1. This IPL language does not affect the outcome here, as Fessler makes clear that his claim to additional commissions is not based on the IPLs and concedes that the IPLs are not enforceable contracts.

2

the last day of the full-Plan period, and before or after the affected payment has been released.

Def.'s Ex. 1–3. The IPLs also included a disclaimer providing for "Review of a Specific Transaction." The IPL for the first half of 2017 stipulated that

> If a specific customer transaction has a disproportionate effect on an incentive payment when compared with the opportunity anticipated during account planning and used for the setting of sales objectives, or is disproportionate compared with your performance contribution towards the transaction, IBM reserves the right to review and, in its sole discretion, adjust the incentive achievement and/or related payments.

Def.'s Ex. 2. The IPLs for the first half of 2016 and second half of 2017 contained essentially identical provisions.

For each plan period, both before and after Fessler accepted the applicable IPL, IBM provided Fessler with a PowerPoint presentation describing the terms of the commission plan he was offered and ultimately accepted. Each PowerPoint stated that "payments" and "earnings opportunit[ies]" were "uncapped." IBM managers repeated these statements to Fessler during sales meetings.

Fessler alleges that these oral and written statements obligated IBM to pay him uncapped commissions. Fessler further alleges that IBM failed to pay him the full commission he was owed on three separate deals. First, Fessler was paid $50,000 rather than the $258,200 he expected from a deal that closed in June 2016 with the United States Census Bureau. IBM explained that Fessler was credited with only a portion of the deal's revenue because of Fessler's contribution to the deal. Second, in May 2017, Fessler was paid about $30,000 rather than the $100,000 he expected on a deal with the Department of Defense Special Operations Command. IBM explained that the account had been put under a Target Account Absolute Plan, under which approximately 3.5% of sales revenue was allocated to commissions for all sales representatives involved in a sale of IBM products and services to the Department of Defense

3

Special Operations Command. Third, Fessler closed a deal in December 2017 with the United States Customs and Border Protection Agency. Contrary to Fessler's expectations, Fessler did not receive a commission on the deal. After the deal closed, IBM explained that the account had been removed from Fessler's responsibility.

### III.

At issue now is IBM's Motion to Dismiss Fessler's Complaint pursuant to Rule 12(b)(6), Fed. R. Civ. P. Fessler's Complaint asserts six claims: (i) breach of oral and/or implied contract, (ii) *quantum meruit*, (iii) unjust enrichment, (iv) fraudulent misrepresentation, (v) negligent misrepresentation and (vi) punitive damages. Each claim is addressed below.

### A.

Count I of Fessler's Complaint alleges breach of an oral and/or implied contract. Fessler concedes that the IPLs are not enforceable contracts, but he argues that he has an oral and/or implied contract with IBM based on (i) a PowerPoint presented to Fessler that stated "earnings opportunity" and "payments" were "uncapped," (ii) statements by IBM executives that commissions would not be capped and (iii) the fact that, to Fessler's knowledge, IBM had never capped a commission. IBM argues that Fessler's breach of oral and/or implied contract claim fails as a matter of law because Fessler's IPLs preclude the existence of an oral and/or implied contract by establishing that no meeting of the minds occurred. This argument is correct.

Under Virginia law,[4] "mutuality of assent—the meeting of the minds of the parties—is an essential element of all contracts." *Green's Ex'rs v. Smith*, 146 Va. 442, 452 (Va. 1926). The IPLs make clear that no meeting of the minds occurred here, as they establish that IBM lacked the intent to obligate itself to pay Fessler uncapped commissions. Rather, the IPLs indicate that

---

[4] The parties agree that Virginia law applies to this diversity action.

4

IBM intended the opposite, namely to maintain sole discretion over the amount, if any, of commission payments. Each IPL clearly stated that, "The Plan does not constitute an express or implied contract or a promise by IBM to make any distributions under it." Def.'s Ex. 1–3. Each IPL also specified that "IBM reserves the right to adjust the Plan terms, . . . or to modify or cancel the Plan." *Id.* The IPLs further provided that "IBM reserves the right to review and, in its sole discretion, adjust the incentive achievement and/or related payments" when "a specific customer transaction has a disproportionate effect on an incentive payment when compared with the opportunity anticipated during account planning . . . or is disproportionate compared with [Fessler's] performance contribution towards the transaction." Def.'s Ex. 2, 3.[5] The IPLs further provided that "IBM reserves the right to review and, in its sole discretion, adjust or require repayment of incorrect incentive payments . . . , including [those resulting from] errors in the creation or communication of sales objectives." Def.'s Ex. 1–3. Accordingly, as these IPL provisions make clear, IBM intended to maintain exclusive control over the amount of commission payments under the Plan, and, indeed, over whether the Plan would continue to remain in effect. This intent to maintain complete control over the Plan, including its continued existence, is incompatible with the intent to enter a contract guaranteeing commissions would not be capped. Accordingly, no meeting of the minds occurred and Fessler's breach of oral and/or implied contract claim fails as a matter of law.

This conclusion is supported by *Jensen v. International Business Machines Corp.*, 454 F.3d 382 (4th Cir. 2006), in which the Fourth Circuit affirmed the grant of summary judgment to IBM in a similar action in which a salesman claimed IBM underpaid the commissions he was due. The plaintiff in *Jensen* argued that his employee quota letter (essentially equivalent to

---

[5] The 2016 IPL contained essentially identical language that differed only in form. Def.'s Ex. 1.

Fessler's IPLs) and an accompanying brochure created an obligation that IBM not cap commissions. The Fourth Circuit rejected this argument, reasoning that IBM's disclaimers of any obligation to pay commissions, similar to the disclaimers in Fessler's IPLs, "manifested [IBM's] clear intent to preclude the formation of a contract." *Id.* at 388. The Fourth Circuit thus "view[ed] th[e] case as an effort by [plaintiff] to create an enforceable contract out of a policy that expressed IBM's contrary intentions" and concluded that the "Plan [is] no more than an announcement of a policy expressing [IBM's] intent to pay incentives in specified amounts but retaining full discretion to determine amounts until the time that they are actually paid." *Id.* at 390. Although *Jensen's* holding—that the documents describing the incentive plan did not constitute an offer that the plaintiff could accept—is not dispositive here, the *Jensen* Court's reasoning is controlling. Specifically, Fessler's argument that IBM intended to obligate itself not to cap commissions is foreclosed by the *Jensen* Court's conclusion that IBM clearly expressed its intent to retain full discretion over commission payments. Moreover, in a more closely analogous case, the Second Circuit concluded that the plaintiff's IPL precluded the existence of an implied-in-fact contract arising out of IBM's prior actions because the IPL made "clear that IBM never intended to create a binding contract governing incentive compensation." *Kavitz v. IBM*, 458 F. App'x 18, 20 (2d Cir. 2012). Indeed, every circuit that has addressed similar claims regarding IBM's alleged underpayment of commissions has rejected these claims on the basis of reasoning that is fatal to Fessler's claim. *See Wilson v. IBM*, 610 F. App'x 886, 888–89 (11th Cir. 2015) (assuming without deciding that the IPL was an enforceable contract but nonetheless holding that "IBM holds the cards with respect to how sales commissions are calculated . . . the IPL gave IBM the unilateral and unconditional authority to modify [plaintiff's] sales quota"); *Geras v. IBM*, 638 F.3d 1311, 1317 (10th Cir. 2011) (concluding that the IPL "made clear IBM's intent

6

not to enter into an enforceable contract to provide incentive payments"). Like the Fourth Circuit in *Jensen*, these circuits were determining whether the plaintiffs' IPLs created an obligation not to cap commissions. *See Wilson*, 610 F. App'x at 888; *Geras*, 638 F.3d at 1314. However, the reasoning is nevertheless applicable here because the IPLs in those cases contained disclaimers similar to the disclaimers in Fessler's IPLs. *Wilson*, 610 F. App'x at 887–87; *Geras*, 638 F.3d at 1313–14.

Fessler's argument that the IPLs do not undermine his breach of implied and/or oral contract claim because he alleges the existence of "a separate and enforceable contract not to cap commissions" is unavailing. The IPLs clearly state that "*The Plan* does not constitute an express or implied contract or a promise by IBM to make any distributions under it." Def.'s Ex. 1–3 (emphasis added). The IPLs clarify that this "Plan" is "The Incentive Plan to which [Fessler was] assigned." *Id.* And Fessler acknowledges that the PowerPoint on which he bases his contract claim "describe[ed] the terms of the commission plan being offered to [him]." Pl.'s Compl. ¶ 12. Thus, the PowerPoint that Fessler alleges created a contract is part of "The Plan," which IBM clearly stated did "not constitute an express or implied contract or a promise by IBM to make any distributions under it."[6] Def.'s Ex. 1–3. This unambiguous statement shows that, as a matter of law, IBM lacked the intent to enter a contract not to cap commissions.

Furthermore, it would be meaningless, if not contradictory, to argue that IBM contractually agreed not to cap commissions that, according to the IPLs, IBM had no obligation to pay. Because the IPLs reserved IBM the right to modify or eliminate the Plan, a promise not to cap commissions paid pursuant to the Plan would be hollow. Indeed, it seems such a promise

---

[6] Similarly, the IBM managers' oral representations and IBM's history of paying commissions on which Fessler also bases his contract claim refer to the same Plan and thus cannot be the basis of an oral or implied contract, as there was no mutual assent.

7

would be illusory and unenforceable under Virginia law. *See Town of Vinton v. City of Roanoke*, 195 Va. 881, 886 (Va. 1954) (citation omitted) ("[T]here must be absolute mutuality of agreement, so that each party has the right to hold the other to a positive agreement. Both parties must be bound or neither is bound.").

Fessler's argument that his contract claim should not be dismissed because IBM admits that it has an obligation not to cap commissions is equally unavailing. Fessler relies on testimony from an IBM corporate designee, a former IBM Vice President of Software Sales and two IBM managers taken during the course of litigation in *Choplin v. International Business Machines Corp.*, No. 16-cv-1412 (M.D.N.C. filed Dec. 16, 2016), a district court case dismissed by the parties prior to resolution.[7] Fessler's reliance on this testimony is unavailing, as Fessler ignores the context of the purported admissions. Specifically, the IBM witnesses testified that IBM had an obligation not to set an arbitrary ceiling on the total amount of compensation a salesperson could receive.[8] Martinotti Dep. 105:20–107:17; Batthany Dep. 99:17–101:15; Maleki Dep. 60:23–61:10; Dorsey Dep. 74:17–75:4. Each witness maintained that IBM retained the authority to adjust the amount of commission awarded for specific deals. *Id.* Although Fessler alleges that his commissions were arbitrarily capped, he does not allege that IBM set a particular ceiling on the total amount of compensation he could receive, but rather he complains about specific adjustments. Moreover, any admission by IBM, in a separate litigation involving different parties, of an obligation not to cap commissions is unpersuasive in light of the IPLs'

---

[7] Notably, although some of the claims survived IBM's Motion for Judgment on the Pleadings, the North Carolina district court did not consider the IPLs' effect on the claims because the plaintiff, perhaps strategically, neglected to incorporate the IPLs into the complaint. *See Choplin v IBM*, No. 16-cv-1412, at *8–*10 (M.D.N.C. Aug. 30, 2017) (R. & R.), adopted by No. 16-cv-1412 (M.D.N.C. Sept. 18, 2017) (Order).

[8] It is not clear IBM owes such an obligation to Fessler. Fessler concedes that his IPLs are not enforceable contracts and, for the reasons discussed herein, the IPLs preclude the existence of a separate contract not to cap commissions. Thus, IBM's statements that "earnings opportunity remains uncapped" were, as the Fourth Circuit noted in addressing similar statements, merely "the announcement of a nonbinding intention." *Jensen*, 454 F.3d at 390.

unambiguous disclaimers clearly evincing IBM's intent not to be obligated to make commission payments. As the Fourth Circuit concluded in *Jensen*, the statements in the PowerPoint and by IBM managers were nothing more than "the announcement of a nonbinding intention, much like that in which an employee is told that he will be paid a bonus if the company does well . . . . [A]ny disagreement over what was announced does not form the basis for a lawsuit for breach of contract." 454 F.3d at 390. As such, Fessler's breach of an oral and/or implied contract claim fails as a matter of law.

### B.

Counts II and III of Fessler's Complaint allege claims for *quantum meruit* (breach of a contract implied in fact) and unjust enrichment (breach of a contract implied in law). The parties agree that Virginia law requires proof of the same elements to succeed on these claims. Specifically, to succeed on either theory, Fessler must establish that (i) he "conferred a benefit on" IBM, (ii) IBM "knew of the benefit and should reasonably have expected to repay" Fessler and (iii) IBM "accepted or retained the benefit without paying for its value." *Schmidt v. Household Fin. Corp., II*, 276 Va. 108, 116 (Va. 2008); *see also Raymond, Colesar, Glaspy & Huss, P.C. v. Allied Capital Corp.*, 961 F.2d 489, 490–91 (4th Cir. 1992). Additionally, the Supreme Court of Virginia has made clear that "[o]ne may not recover under a theory of implied contract . . . without adducing other facts to raise an implication that the defendant promised to pay the plaintiff for such benefit." *Nedrich v. Jones*, 245 Va. 465, 476 (Va. 1993). Fessler's *quantum meruit* and unjust enrichment claims fail as a matter of law because IBM did not reasonably expect to pay Fessler additional commissions, nor did IBM promise to do so.

The facts reveal that IBM did not reasonably expect to pay Fessler greater commissions. The IPLs made it possible for Fessler to receive commissions in addition to his salary,[9] but clearly foreclosed any guarantee of commission payments. Fessler accepted the terms of each of the three relevant IPLs. Because Fessler accepted these IPLs, and they clearly stated that IBM could modify or eliminate Fessler's commission payments, neither IBM nor Fessler could have reasonably expected that IBM would pay Fessler commissions greater than the commissions he received.

Moreover, under Virginia law, a party "may not recover under a theory of implied contract . . . without adducing other facts to raise an implication that the defendant promised to pay the plaintiff for such benefit." *Nedrich*, 245 Va. at 476. The facts here establish the opposite: IBM expressly disclaimed any obligation to pay Fessler commissions on his sales. Indeed, each IPL clearly stated that "The Plan does not constitute . . . a promise by IBM to make any distributions under it." Def.'s Ex. 1–3. Fessler cannot plausibly allege that IBM promised to pay him greater commissions given this clear statement to the contrary. *See also Kavitz v. IBM*, 458 F. App'x 18, 20 (2d Cir. 2012) (internal quotation marks and citations omitted) (rejecting a claim of promissory estoppel because "the Plan negates any inference that IBM made a clear and unambiguous promise to pay incentive compensation"). Any statements made by IBM or its employees about uncapped commissions were merely "the announcement of a nonbinding

---

[9] IBM correctly argues that Fessler's implied contract claims fail for the additional reason that "an at-will salaried employee . . . should not be able to recover for unjust enrichment because the payment of a salary represents payment for work performed during the term of such employment." *Appleton v. Bondurant & Appleton, P.C.*, 68 Va. Cir. 208, 225 (Va. Cir. 2005). Although Fessler is correct that this principle does not apply where "an agreement provides otherwise," Fessler has failed to allege plausibly that an agreement provided otherwise. *Id.* As discussed above, Fessler's IPLs clearly provided that commissions were discretionary. *See* Def.'s Ex. 1–3.

10

intention." *Jensen v. IBM*, 454 F.3d 382, 390 (4th Cir. 2006). As such, Fessler's *quantum meruit* and unjust enrichment claims fail as a matter of law.[10]

### C.

Count IV of Fessler's Complaint alleges fraudulent misrepresentation. To state a claim for fraud under Virginia law, a plaintiff must establish by clear and convincing evidence "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled." *Richmond Metro. Auth. v. McDevitt Street Bovis, Inc.*, 256 Va. 553, 557–58 (Va. 1998). Furthermore, "[i]n order to prove reliance, a plaintiff must demonstrate that its reliance upon the representation was reasonable and justified." *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 629 (4th Cir. 1999) (citation omitted); *see also Masche v. Nichols*, 188 Va. 857, 867–68 (Va. 1949). IBM argues that Fessler (i) failed to plead his fraud claim with the particularity required by Rule 9(b), Fed. R. Civ. P.; (ii) cannot allege the requisite intent to deceive and (iii) cannot allege reasonable reliance. Although the first two arguments are unavailing, the third is successful, and thus Fessler's fraudulent misrepresentation claim fails as a matter of law.

IBM first argues that Fessler fails to satisfy Rule 9(b)'s requirement that "a party . . . state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Although it is perhaps debatable whether Fessler provided sufficient detail about the fraudulent statements allegedly made by IBM sales executives, Fessler satisfied Rule 9(b)'s particularity requirement

---

[10] IBM also argues that Fessler cannot recover under *quantum meruit* or unjust enrichment because the IPLs "were documents that spelled out the parties' respective rights and responsibilities with respect to the payment of commissions," and a party may not recover under either theory when an express, enforceable contract exists. Def.'s Mem. Supp. 13 (citing, among others, *Lion Assocs., LLC v. Swiftships Shipbuilders, LLC*, 475 F. App'x 496, 503 (4th Cir. 2012)). This argument is foreclosed by the Fourth Circuit's decision in *Jensen*, which found that similar documents describing an IBM salesman's commission plan did not constitute an enforceable contract. *Jensen v. IBM*, 454 F.3d 382, 388 (4th Cir. 2006).

11

by providing sufficient detail about the allegedly fraudulent statements in the PowerPoint. The Fourth Circuit has approvingly cited the conclusion of "two noted scholars [that] the circumstances required to be pled with particularity under Rule 9(b) are the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999) (internal quotation marks and citations omitted). Here, Fessler has alleged that, around the time he accepted the IPLs in 2016 and 2017 (time), false representations were made in PowerPoints (place) that "[e]arnings opportunities remain uncapped" (contents) by IBM (identity), causing Fessler to continue to work hard and sell as much as possible (what was obtained). Pl.'s Compl. ¶¶ 14, 76–77. Accordingly, Fessler has satisfied Rule 9(b). *See McCauley v. Home Loan Inv. Bank, F.S.B.*, 710 F.3d 551, 559 (4th Cir. 2013) (finding Rule 9(b) satisfied where the complaint alleged fraud in late summer or fall 2006 at plaintiff's house when an appraiser falsely stated that plaintiff's house was worth at least $51,000, causing plaintiff to accept a $51,000 loan).[11]

IBM next argues that Fessler cannot allege the intent to deceive required to state a claim of fraudulent representation[12] because IBM expressly informed Fessler in his IPLs that IBM had the discretion to adjust commission payments. But these disclaimers do not reveal IBM's motivation for informing salespeople that commissions were uncapped. As Fessler points out, circumstantial evidence may be used to prove a party's intent. *Viney v. Commonwealth*, 269 Va. 296, 301 (Va. 2005). Fessler has alleged that most employers in Fessler's field do not cap

---

[11] This case supports the argument that Fessler satisfies Rule 9(b) with respect to the statements allegedly made by IBM executives. Fessler alleges that unidentified IBM executives made false statements similar to those in the PowerPoint during sales meetings, some of which were after Fessler signed the IPLs in 2016 and 2017. Pl.'s Compl. ¶ 76–77, 79. Similarly, the Fourth Circuit in *McCauley* found Rule 9(b) satisfied where an unidentified appraiser made an allegedly false statement in late summer or fall 2006. *McCauley*, 710 F.3d at 559.

[12] *Richmond Metro. Auth. v. McDevitt Street Bovis, Inc.*, 256 Va. 553, 557–58 (Va. 1998).

commissions and that IBM would be unable to recruit good salespeople if it informed salespeople that their commissions could be capped. Pl.'s Compl. ¶ 50. Accordingly, it cannot be said that Fessler fails to allege plausibly intent to deceive.

IBM's final attack on Fessler's fraudulent misrepresentation claim—the absence of reasonable reliance—is successful. The parties agree that "to prove reliance [under Virginia law,] a plaintiff must demonstrate that its reliance upon the representation was reasonable and justified." *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 629 (4th Cir. 1999) (citation omitted); *see also Masche v. Nichols*, 188 Va. 857, 867–68 (Va. 1949). Here, Fessler cannot establish that he reasonably relied on IBM's statements that commissions would be uncapped because, as discussed above, the IPLs clearly stated that they did not constitute a promise to make commission payments and that IBM had the authority to adjust any such payments. Def.'s Ex. 1–3.

Fessler's reliance on *Hitachi Credit America Corp. v. Signet Bank*, 166 F.3d 614, 630 (4th Cir. 1999), for the proposition that contractual disclaimers are not an automatic bar to fraud actions is misplaced. Although a correct statement of law, it does not save Fessler's fraud claim. In *Hitachi Credit America Corp.*, the Fourth Circuit noted that "a contractual disclaimer of reliance is not a prophylactic against a claim of fraud. . . . [A] buyer can show that a contract of sale was induced by the seller's fraud, even though the written contract contains covenants waiving warranties or disclaiming or limiting liabilities." Yet, IBM here did not merely disclaim reliance or limit its liability; rather, IBM expressly warned Fessler of the very fact he now complains of, namely that IBM could, and indeed might well, modify or eliminate his commission payments. Such an express disclaimer is not the sort of general disclaimer of

reliance referred to in *Hitachi Credit America Corp.*, but rather explicitly informed Fessler of unfavorable terms. As such, *Hitachi Credit America Corp.* is inapposite.

Fessler also relies, unsuccessfully, on deposition testimony from the *Choplin* case. First, Fessler argues that an IBM corporate designee's "yes" response to the question, "it would be reasonable for a salesperson like Bobby Choplin to rely on the information in Exhibit 65, 66 and 67 regarding their compensation plan?"[13] establishes that Fessler reasonably relied on IBM's statements that commissions would be uncapped. Fessler fails to identify or provide the referenced exhibits. Yet, even assuming one of the referenced exhibits is identical to the PowerPoint on which Fessler bases his claims, the corporate designee's general affirmative response cannot establish Fessler's reasonable reliance given the exclusive discretion that the IPLs reserve for IBM over commission payments. This is especially so because IBM's corporate designee later explained that the IPLs reserved IBM the right to adjust commissions on specific transactions. *Id.* at 107:9–108:3.

Second, Fessler relies on testimony by Choplin's immediate manager in that case. Specifically, Fessler relies on Choplin's manager's affirmative answer to the question "would it be reasonable for someone to understand that their commission payments were uncapped in the first half of 2015?" Batthany Dep. 79:16–19. Yet, Fessler fails to mention Choplin's manager's explanation that although total "[e]arnings opportunities remain uncapped, . . . transactions don't remain uncapped," which, as Choplin's manager explained, is stated in the IPL. *Id.* at 99:7–16. As such, the brief out-of-context exchange Fessler cites—the opinion of a manager about a hypothetical salesman's commissions in a prior year and different location—does not establish that Fessler reasonably relied on IBM's statements that commissions would be uncapped.

---

[13] Martinotti Dep. 67:22–68:1.

Third, Fessler relies on a former IBM Vice President of Software Sales who testified that, "[i]f I was [sic] a sales representative and I read [the statement that 'earnings opportunity remains uncapped,'] I would think that my earnings were uncapped." Dorsey Dep. 48:1–2. Yet, the referenced document—which plaintiff does not identify—was viewed and discussed in isolation, ignoring the context, namely that the IPLs clearly state that IBM may adjust commissions. The IPLs in this case explicitly state that IBM did not promise to make any commission payments under the Plan, that IBM had the right to modify or cancel the Plan and that IBM could adjust commission payments in its sole discretion. Def.'s Ex. 1–3. As such, any reliance by Fessler on IBM's statements that commissions were uncapped was not reasonable as a matter of law. Accordingly, Fessler's fraudulent misrepresentation claim must be dismissed.

### D.

Count V of Fessler's Complaint asserts a claim for constructive fraud.[14] Under Virginia law, constructive fraud requires proof of the same elements as actual fraud except "the plaintiff is only required to plead that the false representation was made innocently or negligently" rather than intentionally or knowingly. *Sales v. Kecoughtan Housing Co.*, 279 Va. 475, 481 (Va. 2010); *Richmond Metro. Auth. v. McDevitt Street Bovis, Inc.*, 256 Va. 553, 557–58 (Va. 1998). Fessler's constructive fraud claim fails for the same reason that his actual fraud claim fails, namely that Fessler cannot establish reasonable reliance.

IBM argues that Fessler's constructive fraud claim fails for the additional reason that it is premised on a promise of future action, namely that IBM made a promise to pay Fessler additional commissions in the future. Under Virginia law, a promise of future action maynot

---

[14] Fessler captioned his claim "negligent misrepresentation," but the parties agree Fessler intended to assert a constructive fraud claim.

support a claim of constructive fraud. *Supervalu, Inc. v. Johnson*, 276 Va. 356, 368 (Va. 2008). Fessler argues that his constructive fraud claim is not based on future action because "IBM represented that its policy was that commissions were uncapped when that wasn't the case." Pl.'s Opp'n 21. Yet, Fessler's Complaint alleges, in the section captioned "Negligent Misrepresentation," that "IBM represented to Mr. Fessler that Mr. Fessler's commission *would not be capped.*" Pl.'s Compl. ¶ 83 (emphasis added). However, Fessler alleges earlier in his Complaint that he was presented with a PowerPoint that stated "[e]arnings opportunity remains uncapped" and "payments" are "uncapped." *Id.* ¶ 14. Because Fessler incorporated the prior paragraphs of his Complaint, including this allegation, into his constructive fraud claim, the Complaint plausibly alleges a false representation not based on a promise of future action. However, Fessler's constructive fraud claim must nonetheless be dismissed because, as discussed with respect to his negligent misrepresentation claim, Fessler cannot establish reasonable reliance.

### E.

Finally, Count VI of Fessler's Complaint asserts a claim for punitive damages. Because Fessler's fraud claim fails as a matter of law, and his claim for punitive damages is derivative of his fraud claim, Fessler's claim for punitive damages must be dismissed as well. *See Zedd v. Jenkins*, 194 Va. 704, 706–07 (Va. 1953) ("The general rule is that a plaintiff cannot maintain an action to recover mere punitive or exemplary damages, and that a finding of compensatory damages is a prerequisite to an award of exemplary damages.").

Accordingly, and for the reasons discussed above, IBM's Motion to Dismiss must be granted.

An appropriate Order will issue.

Alexandria, Virginia
November 28, 2018

/s/ [signature]
T. S. Ellis, III
United States District Judge