1

```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF VIRGINIA
                        ALEXANDRIA DIVISION
```

------------------------------x
                                :
JUSTIN FESSLER,                 : Civil Action No.
                                :
                    Plaintiff   : 1:18-CV-798
                                :
            versus              :
                                :
INTERNATIONAL BUSINESS          :
MACHINES CORPORATION,           :
                                :
                    Defendant.  : August 31, 2018
------------------------------x

        The above-entitled Motion hearing was continued
before the Honorable T.S. Ellis, III, United States District
Judge.

                    A P P E A R A N C E S

FOR THE PLAINTIFF:      TIMOTHY RYAN CLINTON, ESQ.
                        Clinton Brook & Peed
                        1455 Pennsylvania Ave NW
                        Suite 400
                        Washington, DC 20004

                        MARK SIGMON, ESQ.
                        Sigmon Law, PLLC
                        5 West Hargett Street, Suite 1001
                        Raleigh, NC 27601

                        MATT LEE, ESQ.
                        Whitfield Bryson & Mason LLP
                        900 West Morgan Street
                        Raleigh, NC 27603

FOR THE DEFENDANT:      MATTHEW FREDERICK NIEMAN, ESQ.
                        Jackson Lewis PC (VA)
                        10701 Parkridge Blvd
                        Suite 300
                        Reston, VA 20191

                        JUSTIN BARNES, ESQ.
                        Jackson Lewis PC
                        1155 Peachtree Street, N.W., Suite 1000
                        Atlanta, GA 30309
```

2

1

Appearances continued:

2

OFFICIAL COURT REPORTER:     MS. TONIA M. HARRIS, RPR

3                            United States District Court
                             Eastern District of Virginia

4                            401 Courthouse Square
                             Ninth Floor

5                            Alexandria, VA 22314
                             703-646-1438

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

**P R O C E E D I N G S**

1

2    (Court proceedings commenced at 11:32 a.m.)

3            THE DEPUTY CLERK:  Justin Fessler versus

4    International Business Machines Corporation.  Civil Case No.

5    1:18-CV-798.

6            THE COURT:  Who is here for the plaintiff?

7            MR. SIGMON:  Good morning, Your Honor.  Mark Sigmon

8    for the plaintiff along with Matt Lee and Tim Clinton.

9            THE COURT:  All right.  And for the defendant.

10            MR. BARNES:  Justin Barnes on behalf of the

11    defendant along with co-counsel, Matt Nieman.

12            THE COURT:  All right.  The matter is before the

13    Court on a motion to dismiss.  This is a dispute about

14    commissions due to a salesperson for IBM.  I've read your

15    briefs.  But let me hear first from the defendant.

16            Mr. Simon [sic], right?

17            MR. BARNES:  Mr. Barnes.

18            THE COURT:  Barnes, yes, I'm sorry, of course.  Mr.

19    Simon [sic] is over here.  Sigmon, I'm sorry.

20            All right.  You may proceed.

21            MR. BARNES:  Thank you, Your Honor.  As Your Honor

22    knows, plaintiff has asserted a variety of claims in this case

23    related to allegedly unpaid commissions and IBM has moved to

24    dismiss all of plaintiff's claims based in large part on the

25    clear disclaimer set forth in the plaintiff's commission plan

4

1   and it's certainly IBM's contention that the Fourth Circuit

2   has already decided this issue in the *Jensen* case.  In *Jensen*,

3   which was decided in 2006.

4         In *Jensen*, the plaintiff, like Mr. Fessler, was a

5   sales representative for IBM and sued IBM for allegedly unpaid

6   commissions because IBM had imposed a 200 percent rule,

7   whereby the plaintiff's commissions were reduced when he

8   exceeded two percent of his sales quota.

9         And the plaintiff sued IBM claiming that IBM should

10  not have done that.  And importantly, one of the arguments

11  that the plaintiff in the *Jensen* case made was that he had

12  received a glossy brochure which contained language in it very

13  similar to the uncapped language that Mr. Fessler is relying

14  on in this case.

15        Specifically in the *Jensen* case this glossy brochure

16  said, "There are no caps to your earnings.  The more you sell,

17  the more revenue and incremental profit for IBM and the more

18  earnings for you."

19        So there are no caps.  The more you sell, the more

20  you earn.

21        The Fourth Circuit in affirming dismissal of the

22  plaintiff's claims, first noted that the disclaimers in Mr.

23  Jensen's sales plan precluded the creation of any agreement or

24  contract that would require IBM to pay additional commissions

25  to Mr. Jensen, but notably the Fourth Circuit went on to

5

1    address the plaintiff's argument about this uncaps language in

2    the glossy brochure.  And let me just point out that the

3    plaintiff in *Jensen* his commission plan had a "Right to Modify

4    or Cancel" clause that had very similar language as the "Right

5    to Modify or Cancel" clause in Mr. Fessler's commission plan,

6    which basically said the plan doesn't constitute a promise by

7    IBM to pay any certain amount of commissions and that IBM

8    reserves the right to modify or cancel the plan.

9        The Fourth Circuit, after holding that that

10   disclaimer language precluded the formation of any agreement

11   that would require IBM to pay additional commissions, went on

12   to address this glossy brochure with the uncaps language, and

13   the Court noted that -- first disagreed with the plaintiff

14   that there was in fact a cap, but aside from that said, In any

15   event, even if this 200 percent rule could be construed as

16   imposing a cap, and even if that could be construed as being

17   inconsistent with this glossy brochure that says your

18   commissions would be uncapped, it didn't matter because the

19   disclaimer language in the plaintiff's commission plan gave

20   IBM the right to modify that commission plan.

21       The Fourth Circuit specifically said IBM would have

22   been within its rights under *Jensen's* purported contract to

23   introduce the 200 percent rule even after the deal closed,

24   based on the disclaimers contained in Mr. Jensen's commission

25   plan.

6

1          THE COURT:  Well, as you know, the plaintiff says

2     his case is distinguishable from that because of the

3     PowerPoints.  Right?

4          MR. BARNES:  Respectfully, Your Honor, I don't

5     believe plaintiff even addressed the *Jensen* case or attempted

6     to distinguish it.  But if he had, my response would be that

7     the PowerPoint in this case, which by the way there is not

8     even an affirmative allegation that Mr. Fessler ever even saw

9     it.  But in any event, the PowerPoint that has the uncapped

10    language is just like the glossy brochure in *Jensen* that has

11    the uncapped language.

12             And I would point out that Mr. Fessler's commission

13    plan, the disclaimers in that plan apply not only to the IPL,

14    the incentive plan letter itself, but also apply to any of the

15    educational materials on IBM's website, including the very

16    PowerPoint that he's referring to now.  Specifically, the

17    "Right to Modify or Cancel" section of Mr. Fessler's

18    commission plan says, "'The plan' does not constitute an

19    express or implied contract or promise by IBM to make any

20    distributions and that IBM reserves the right to adjust 'the

21    plan' terms."  And then it goes on to define the plan as

22    including not just the incentive plan letter, but also all of

23    the materials located on IBM's incentives workplace website,

24    which is an internal Intranet where salespeople and managers

25    can gather certain educational materials about their incentive

7

1   plans, including the very PowerPoint that he's relying on now.

2          THE COURT:  Does IBM contend that there's a written

3   contract concerning commissions between the plaintiff and IBM?

4          MR. BARNES:  IBM contends that there is a written

5   document between the parties that spells out the party's

6   respective rights and responsibilities.

7          THE COURT:  What is that?

8          MR. BARNES:  That is the incentive plan letter that

9   was attached to IBM's motion to dismiss.

10          THE COURT:  All right.

11          MR. BARNES:  And that is -- that is a document that

12   spells out the party's respective rights and responsibilities,

13   but it does not impose any contractual obligation on IBM to

14   pay any additional commissions beyond what it in its sole

15   discretion determined to pay Mr. Fessler.

16          And I would note that the Fourth Circuit is not the

17   only Court to decide this issue.  The Second Circuit, the

18   Tenth Circuit, the Eleventh Circuit and countless district

19   courts across the country have dismissed similar claims.  And

20   admittedly, Your Honor, not all of those cases involved

21   allegations of uncapped language or allegations of fraud, but

22   I've already mentioned the *Jensen* case.

23          There's also another case where there was an

24   allegation of fraud and there was an allegation that the

25   plaintiff had been promised uncapped commissions and that was

8

1   the *Schwarzkopf v. IBM* case in the Northern District of

2   California.  And in that case the plaintiff brought contract

3   claims, but also brought fraud and promissory estoppel claims.

4   And alleged in that case, I'm reading from the case,

5   *Schwarzkopf* points to numerous allegedly false representations

6   by his supervisors that he claims falsely represented that his

7   commission on the Cisco deal, the deal at issue in that case,

8   would not be capped.

9        The Court went on to say, "The clear disclaimers in

10  the IPL put him on notice that IBM had the right to adjust his

11  commissions."  So even if these statements were made to him,

12  he cannot show as a matter of law any reasonable reliance on

13  those statements in light of the very clear disclaimer in his

14  incentive plan.

15       So it's IBM's position that IBM is up-front with

16  sales representatives about the policies applicable to their

17  commission plans.  These commission plans come out every six

18  months and every single one contains the same disclaimer

19  language in it.  And if Mr. Fessler were to claim that he

20  never read that, as Your Honor knows, he is imputed with that

21  knowledge.  He cannot simply claim that I never read it and it

22  not be subject to those terms as the Fourth Circuit noted in

23  the *Jensen* case.

24       THE COURT:  Well, I take it since you contend there

25  is a written agreement between the parties that quantum meruit

1 would not apply.  Is that your view?

2          MR. BARNES:  That's correct, Your Honor.  One of the

3 arguments we made on quantum meruit was certainly that there

4 is a document between the party that spells out parties'

5 respective rights and responsibilities and therefore he cannot

6 bring a quantum meruit claim to recover something that he is

7 not entitled to recover under the clear terms of the

8 commission plan.

9          THE COURT:  All right.  Thank you.  Let me hear from

10 the plaintiff.

11          MR. SIGMON:  Thank you, Your Honor.  Mark Sigmon on

12 behalf of the plaintiff.  And I wanted to introduce quickly

13 Mr. Fessler, who is here today.

14          Your Honor, I think the most important facts in this

15 case are that IBM has admitted under oath that the statement

16 in the PowerPoint, the exact statement and the exact power

17 point that Mr. Fessler received, created an obligation not to

18 cap them.  That's the exact words.  They had an obligation.

19 They admitted that that statement was reasonable for sales

20 people, just like Mr. Fessler, to rely on to believe as true.

21 So the only --

22          THE COURT:  The statement was that they were

23 uncapped.

24          MR. SIGMON:  Uncapped.

25          THE COURT:  So they can be infinite?

1      MR. SIGMON:  Well, it will be controlled by the

2  percentage of the percentage commission you got.  So if you

3  sold an infinite number of goods, I suppose five percent of

4  infinity would be infinity.  But the point is it's not -- it's

5  not capped.

6      And so the only issue then is what is happening and

7  they've already admitted what that is too.  Two of their

8  witnesses in a previous case that we've referenced both

9  testified that what happened -- essentially what happened to

10  Mr. Fessler here is capping.  In the earlier case, there was

11  e-mails where internal IBM e-mails at the time before

12  litigation where IBM said discussed what they were doing to

13  the earlier plaintiff and said they're capping him.

14      And we've alleged quite reasonably that there will

15  be similar e-mails in this case.  And so if IBM has admitted

16  an obligation not to cap, and the only issue is did they cap,

17  and the evidence, I think, is clearly at a 12(b)(6) stage,

18  certainly now, but I think the evidence will show that they

19  did cap.  And therefore, I'm not sure what's left.  That to me

20  is a contract claim.

21      Let me address *Jensen* very quickly because IBM

22  relies a lot on that.  First of all, that case only involved a

23  breach of the IPL.  There's no mention of fraud, no mention of

24  constructive fraud, no mention of anything else.  So *Jensen* is

25  only about that.  And there's no mention of a PowerPoint in

1 there too.

2        Number two, of course *Jensen* doesn't have any of the

3 allegations that we have that I just mentioned about the

4 obligation that they've admitted; their reliance that's

5 reasonable, that they've admitted; and the fact that there was

6 a cap.

7        There's another way that *Jensen* is further

8 distinguishable, Your Honor, which is that in *Jensen* there was

9 this 200 percent rule.  Where essentially it said that once

10 you've reached 200 percent of your quota, your quota

11 percentage is kicked down to 1 percent.  We don't have that

12 here.  There is no 200 percent rule in this case.

13        We do have something else called the "significant

14 transaction exception."  And that's the thing they tried to

15 work on in *Choplin*.  The significant transaction exception

16 here has two prongs.  The first says if we get your quota

17 wrong or your territory wrong, we can fix it.  There's no --

18 we've alleged that doesn't apply here.  I don't think it does.

19        The second prong is called a "relative

20 contribution."  And it says that if your contribution to a

21 sale is not proportional to somebody else's, we can adjust

22 your commission.  They tried to claim that in the earlier

23 case.  The problem is that there was zero evidence that they

24 did any analysis of relative contribution between salespeople.

25 What they did was create a 10 percent cap on everybody and

12

1  they never -- it's not like they allocated the money, it's not

2  like they said we want to save money from this person and

3  we'll give it to this person.  That's not what they did.  They

4  just cut everyone to save money to a secret internal 10

5  percent budget.

6          And so this 200 percent rule in *Jensen* doesn't apply

7  here.  We have this other thing that we've alleged doesn't

8  apply and we think there's plenty of evidence on that.

9          So again, there is no fraud or constructive fraud

10  based in *Jensen*.  And of all the cases that IBM cited, in all

11  the cases, there's only two that ever mentioned they have a

12  fraud claim.

13          And just to mention one of them, the *Schwarzkopf*

14  case.  In the *Schwarzkopf* case, Your Honor, the Court actually

15  concluded, and this is near the end, and arguing against IBM's

16  -- and concluding that IBM was correct said, "First, no one

17  affirmatively told *Schwarzkopf* that he would receive a full

18  commission."  There was no representation in that case that he

19  would receive a full commission.  There was no PowerPoint in

20  that case.  We have this PowerPoint that says, "you shall not

21  be capped" that they've already admitted under oath, you know,

22  that -- that admitted under oath creates that obligation.  I

23  think *Schwarzkopf* probably got it right about fraud.  There

24  was just no statement there that was fraudulent.  We've

25  alleged that.

1          The only other case of all the ones they've

2    mentioned is the *Pero* case.  The *Pero* case same thing, no

3    mention of the PowerPoint, no mention of any specific

4    fraudulent representation at all.

5          And so I don't think that *Jensen* controls even the

6    contract claim here, but if it does control that, that's all

7    it controls and it doesn't control the fraud or the

8    constructive fraud, which frankly, to some degree are the

9    center of the plaintiff's case.

10          And finally, Your Honor, opposing counsel mentioned

11   that we did not allege that Mr. Fessler actually saw the

12   PowerPoint.  I think that's just false on its face.  If you

13   look at paragraphs 12, 13, and 14, we said the Mr. Fessler was

14   presented with the PowerPoint.  We then said that he relied on

15   the PowerPoint.  I suppose we did not use the words "he saw

16   the PowerPoint."  He -- that was obviously under 12(b)(6) and

17   under Twombly I think that's sufficient.  He did, in fact, see

18   the PowerPoint.  I know we're in a 12(b)(6) stage, but if I

19   can put him on the stand right now and say that he saw the

20   PowerPoint, I would.  So I think that we clearly allege that.

21          You know, Your Honor, frankly, in sum of all of

22   this, I think that if this was a very first case against IBM

23   in this regard, it seemed to me like it would be the easiest

24   case ever on a 12(b)(6), especially when someone has alleged

25   an obligation not to cap.  The only reason, I think, that IBM

14

1  -- their argument has any sway at all is because there's other

2  cases where they've won.  And I get that.  I get that.  Which

3  is why we never alleged a breach of the IPL.  We acknowledge

4  that the IPL is not a contract.  We've agreed with that.  If

5  you look at our complaint, we never say you've breached the

6  IPL.

7          That's why we said the IPL is not a contract, fine.

8  Then what we have is either an oral or an implied contract or

9  unjust enrichment or quantum meruit, which are all

10  contract-based things.  And even if all of those fail because

11  of the IPL, if even those fail, we have fraud and constructive

12  fraud which in Virginia, as Your Honor well knows,

13  constructive fraud is a negligent representation.  At the very

14  minimum, IBM negligently represented here that its policy and

15  practice was not to cap on anew.  It's always been the cap.

16  They just don't tell people that.

17          So, Your Honor, I respectfully submit that all of

18  those other cases do not control.  This is -- this is a

19  different animal and --

20          THE COURT:  All right.  Thank you.  Mr. Barnes.

21          MR. BARNES:  Thank you, Your Honor.  I just want to

22  respond to a couple of things.  And I'll try to avoid

23  rehashing what we've already discussed.

24          First, well, *Jensen* didn't involve a PowerPoint,

25  maybe back in the early 2000s IBM wasn't using PowerPoints for

15

1   these things, *Jensen* very clearly did involve a glossy

2   brochure that was handed out to sales representatives that

3   said there are no caps.

4          I cannot think of a case that is more on point than

5   what we're addressing here.

6          THE COURT:  You say that's the same as a PowerPoint?

7          MR. BARNES:  Yes, Your Honor, it is.

8          THE COURT:  Go on.

9          MR. BARNES:  And in that case the plaintiff had seen

10  it, affirmatively alleged that he had seen it.

11         In the *Schwarzkopf* case there were allegations in

12  that case that managers told Mr. *Schwarzkopf* that he should be

13  paid in full.  And Mr. Schwarzkopf then -- and encouraged him

14  to maximize his earnings by going out and selling as much as

15  he could on the deal at issue in that case.  So the

16  allegations in *Schwarzkopf*, which led to the dismissal of the

17  plaintiff's fraud claim were very, very similar to those at

18  issue in this case.

19         And this simply is not the first case.  If this were

20  the first case, then I certainly would still believe that it

21  should be dismissed, but it's not.  We've got countless other

22  courts all over the country dismissing similar claims and

23  certainly believe the Court should do the same here.  And I

24  would -- it sounds to me like there's not much of a dispute

25  that the contract in quasi contractual claims should be

16

1   dismissed, but certainly the fraud and constructive fraud and

2   other claims should also be dismissed as well.  I would note

3   that on the fraud versus constructive fraud, we briefed this

4   in our brief so I don't want to rehash it here, but I think

5   based on the allegations that Mr. Fessler has raised, he can

6   only pursue fraud, not constructive fraud since it's based on

7   we'll pay you commissions in the future.  That cannot form the

8   basis for a constructive fraud claim.  He has to be held to

9   the higher burden of actual fraud.

10          THE COURT:  All right.  Thank you.

11          MR. BARNES:  Thank you, Your Honor.

12          THE COURT:  I will take the matter under advisement.

13   You'll hear from me in the near future.  Thank you.

14          MR. BARNES:  Thank you, Your Honor.

15

16          **(Proceedings adjourned at 11:51 a.m.)**

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF REPORTER

 2

 3          I, Tonia Harris, an Official Court Reporter for

 4   the Eastern District of Virginia, do hereby certify that I

 5   reported by machine shorthand, in my official capacity, the

 6   proceedings had and testimony adduced upon the Motion

 7   hearing in the case of the JUSTIN FESSLER, versus

 8   INTERNATIONAL BUSINESS, Civil Action No. 1:18-CV-798, in

 9   said court on the 31st day of August, 2018.

10          I further certify that the foregoing 17 pages

11   constitute the official transcript of said proceedings, as

12   taken from my machine shorthand notes, my computer realtime

13   display, together with the backup tape recording of said

14   proceedings to the best of my ability.

15          In witness whereof, I have hereto subscribed my

16   name, this February 8, 2019.

17

18

19

20

21                        _____
                          Tonia M. Harris, RPR
22                        Official Court Reporter

23

24

25

                                                              17
```